## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **RONALD McCARTER**, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **11-CV-2836-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of the Social**, | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On April 1, 2009, the claimant, Ronald McCarter, applied for disability insurance benefits and supplemental security income under the Social Security Act. (R. 140-44). The claimant alleged disability commencing on March 20, 2009, because of hypertension, and pain, swelling, and lack of function in his right hand, arm, and shoulder. The Commissioner denied the claim, and the claimant filed a timely request for a hearing before an Administrative Law Judge, which the ALJ held on September 27, 2010. (R. 48, 99-100,107-08). In a decision dated January 21, 2011, the ALJ found the claimant not disabled as defined by the Social Security Act and, thus, ineligible for disability insurance benefits or supplemental security income. (R. 27-28). On July 8, 2011, the Appeals Council refused to grant review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-3). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below, this court FINDS that the decision of the Commissioner

is to be REVERSED and REMANDED.

## II. ISSUE[1] PRESENTED

Whether the ALJ erred in failing to indicate what weight, if any, he gave to the opinions of the consultative examiner, Dr. Meleth, and the DDS reviewing physician, Dr. Chastain.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record that support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that conflicts with the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986). The court must scrutinize the totality of the record "to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

---

[1] Because of the court's disposition of this issue, it need not and does not consider the other three issues that the claimant presented in his brief.

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." To make this determination the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[2]

To establish disability, the claimant has the burden of proving the first three steps: namely that (1) he is not engaged in substantial gainful activity; (2) he has a severe impairment or combination of impairments; and (3) his impairment or impairments meet or exceed the criteria in the Listings found in 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant cannot prove that he has a listed impairment, he must prove alternatively that he is unable to perform his previous work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *see also Lucas v. Sullivan*, 918 F.2d

---

[2]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI).  The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases.  *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. Unit A 1981).

1567, 1571 (11th Cir. 1990). Once the claimant shows that he cannot perform his previous work,

the burden shifts to the Commissioner "to show the existence of other jobs in the national

economy which, given the claimant's impairments, the claimant can perform." *Jones v. Apfel*,

190 F.3d at 1228.

"In assessing the medical evidence in [a] case, the ALJ [is] required to state with

particularity the weight he gave the different medical opinions and the reasons therefor."

*Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

## V. FACTS

The claimant was fifty-two years old at the time of the ALJ's decision (fifty-one at the the

time of the hearing) and has a high school education. His past relevant work experience includes

asphalt paving machine operator (medium level, skilled work); park laborer/cleaner (heavy level,

unskilled work); and iron grinder (medium level, semiskilled). (R. 16, 55, 59-62, 193).  The

claimant's alleged disabilities stem from  hypertension, edema in his right arm, and complex

regional pain syndrome of the right arm.  (R. 18, 22, 24, 33).

On September 6, 2006, the claimant received an electric shock while working.  As a

result of that injury, his right "hand was dead," and since the accident, he has experienced edema

in the right arm and pain in that same arm of about five on a ten point scale.  (R. 56-59).  The

claimant went to therapy and regained a bit of feeling in his little finger but not elsewhere. (R.

27-28). Claimant, who is right-handed (R. 11, 56), sued his employer and, during the pendency

of the lawsuit, eventually returned to work, but not to the work position he held before the injury.

Instead, he answered phones, working with his right arm elevated for approximately two years

until the parties reached a settlement in the lawsuit.  Then, on March 20, 2009, he stopped

4

working and has not subsequently worked. (R.  16, 18, 57-58, 162).

According to the pain questionnaire the claimant completed on April 18, 2009 and follow-up disability report on November 5, 2009, the claimant experiences pain focused in his right hand and right arm that spreads to his right shoulder.  (R. 160).  In the November Disability Report and again in a September 23, 2010 fax, he stated that he cannot take prescription pain medication because it caused his blood pressure to increase to high levels; the November report indicates that the doctor specifically told him to stop prescription medication because of the effect on blood pressure and that his arm and hand hurt "all of the time."  (R. 214, 178). However, in a "Report of Contact" on June 11, 2009, the claimant advised the Disability Determination Service that he was taking prescriptions of  Cymbalta (for nerve pain, not for mental issues) and Lyrica every 12 hours, but claimed those medications did not relieve his pain. (R. 160-163).  In an undated function report, the claimant stated that his illness affects lifting, standing, reaching, walking and using his hands but does not affect squatting, bending, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, concentration on tasks, completing tasks, understanding, following instructions, or getting along with others.  (R.  203-214).

*Medical Treatment*

The claimant was hospitalized at UAB Hospital from September 14 - 17, 2006, and records reflect that areas of his right forearm and hand, comprising 2.5% of his total body surface area, received burns.

On August 30, 2007, Dr. Angela Young Achong, a treating neurologist, examined the claimant.  Dr. Young Achong's chart states that "his main problem is swelling specifically position related when he puts his arm down.  He feels excessive swelling of his fingers and his

5

forearm with severe pain.  He is also tender to touch, and he has difficulty with some contractures of the fingers and the wrist." (R. 252).  She records a "concern of noncompliance with occupational therapy because of pain," but notes the occupational therapy reports saying he gained strength and hand grip strength, and further notes improvement in his range of motion and decreased edema.  (R. 252).   The doctor confirmed mild to moderate swelling in all fingers.  In her assessment,  referencing pain and swelling in the claimant's arm, she concluded that he has "some signs and consistent history with the possibility of reflex sympathetic dystrophy." (R. 253).

On October 2, 2007, an electrodiagnostic study report that Dr. Young Achong signed reflects the following: nerve conduction velocities that were slow in the right radial motor nerve at the forearm and elbow and in segments of the right ulnar sensory nerve and the bilaterial median sensory nerve; and the electromyograms showed no motor unit potential in the right first dorsal interosseous muscle but the presence of re-innervation motor unit potentials in the right extensor digitorum communis muscle.  According to Dr. Young Achong, these findings showed a mild to moderate right radial neuropathy localized in such a way that the doctor stated claimant had a "good prognosis for recovery."  She also found that he had a mild bilateral carpal tunnel syndrome and mild right ulnar distal sensory neuropathy. (R. 251).

On February 11, 2008, Dr. Thomas Vetter, a treating anesthesiologist and pain specialist, saw the claimant and noted that his blood pressure had increased, stating that Cymbalta could be the cause.  The doctor described claimant's pain as "reasonably well controlled," and recorded the claimant's evaluation of his pain as a minimum of 3/10 and a maximum of 4/10.  His diagnosis of the claimant's condition included reflex sympathetic dystrophy (a chronic pain

6

condition thought to result from damage to the nervous system), right upper extremity; causalgia (a burning pain from nerve injury), right upper extremity; and peripheral neuralgia and neuritis. (R. 263-64).

In March of 2008, Dr. Vetter saw the claimant and stated that the claimant continues to have "exquisite tenderness and paresthesias [numbness, tingling, and burning] and allodynia [pain from stimulation that would not normally be painful] of the right upper extremities with associated swelling of the right arm."  He further noted that when the claimant's right hand is ungloved, it shows "significant edema" and his right forearm has "moderate muscle wasting." (R. 261).  Dr. Vetter concluded that the claimant suffers from complex regional pain syndrome type 2 of the right upper extremity and peripheral neuralgia and neuritis.  He further stated that, in his opinion, the claimant "would benefit from neuropathic agent such as Lyrica or Neurontin" and should continue physical therapy at an institution or even home stretching to prevent significant hand contractures.  (R. 262).

On May 23, 2009, Dr. Raveendran Meleth, an internal medicine specialist and consultant, examined the claimant and had the following diagnosis: "impaired right hand grip, absent movements in his right thumb and index, and diminished movements in his third, fourth, and fifth fingers.  Anesthesia of the right index, right thumb, and right forearm on the outer side. History of swelling of the right hand, particularly worse when he keeps it down.  He has to keep it elevated all the time."  (R. 230).

On June 4, 2000, Dr. Samuel Chastain, a neurologist consultant, performed a Physical Residual Functional Capacity Assessment on the claimant.  As to the claimant's exertional limitations, Dr. Chastain found that he could occasionally lift 20 pounds; frequently lift 10

pounds; stand and/or walk about 6 hours in an 8 hour day; sit about 6 hours in an 8 hour

workday; and his ability to push and/or pull was limited in the upper extremities.  As to the

claimant's postural limitations, Dr. Chastain found that he could frequently perform all functions

except balancing (never) and crawling (occasionally). As to manipulative limitations, Dr.

Chastain found that he was limited in all categories (reaching, handling, fingering, feeling) and

explained "none rt UE," referring to the claimant's right upper extremity.  He noted that right

hand dexterity is significantly impaired and fine movements are significantly impaired.

However, the claimant had no visual limitations or communicative limitations.   The claimant

should avoid all exposure to unprotected heights and vibrations involving the right upper

extremity.  Dr. Chastain noted "mild to moderate swelling in all fingers, developed contractures

of his wrist & fingers."  Regarding symptoms alleged by the claimant, the doctor found the

claimant's statements to be partially credible, recording decreased motor strength and decreased

sensation from right forearm to his hand.  The doctor noted that the claimant had declined the

offer of a stellate ganglia block "stating he wishes to no longer pursue curative diagnostic

techniques and simply wants to get on whith [sic] his life." Dr. Chastain listed as diagnoses:

complex regional pain syndrome type II of right upper extremity; peripheral neuralgia; and

neuritis. (R. 232-238).

*Other Consultations*

On August 31, 2009, David Bledsoe, an occupational therapist referred by the claimant's

attorney, provided a functional capacity assessment/work readiness evaluation on the claimant.

He stated that the claimant's "primary limitation is pain and fear of movement" and determined

that the claimant is functioning as a one-handed individual.  He found, however, that the claimant

has some ability to use the right hand but that the dexterity of his right hand is more than 50 percent slower than the left, and his handwriting is poor.  As to the claimant's ability to grip with his right hand, Bledsoe found that the claimant could not generate any force with his right hand, and the sphygnamometer measured a significant difference on the right (40) than on the left (140).  On the work restrictions chart, Bledsoe reflected that reaching was restricted with the right hand to occasional use, and under the "Handling, Gripping Grasping" category he included the following entries: Occasional - ".70 of IM Max"; Frequent - ".40 of IM Max"; and Constant - ".20 of IM Max."  He also noted that the claimant had significant edema in his right hand, and substantial asymmetry in the hand size of the right versus left hand.  Further, although the claimant, using what Bledsoe considered good effort, was able to push 40 pounds and pull 45 pounds, Bledsoe noted that the majority of his force came from the left, unaffected side.  In his Functional Work Circuit Summary, Bledsoe determined that the claimant was able to lift up to 10 pounds and carry up to 20 pounds a distance of 36 feet, and indicated that the claimant used his right hand as a "helper" in these particular tasks.  As to the claimant's pain tolerance, Bledsoe listed the claimant's pre-evaluation pain as 5/10, his post-evaluation pain as 6/10, and his pain the day after evaluation as 5/10. Based on his evaluation, Bledsoe recommended that the claimant work at jobs falling in the full light and lower medium categories.  In jobs involving large objects that would require both hands to contribute, he recommended that loads be restricted to sedentary weights of ten pounds.  (R. 277-281).

On April 2010, Jo Spradling, a vocational consultant referred by the claimant's attorney, met with the claimant.  Spradling listed the claimant's diagnoses as reflex sympathetic dystrophy, causalgia, peripheral neuralgia and neuritis of the right upper extremity.  Noting particularly Dr.

Lance's August 13, 2008 opinion that the claimant had "incurred a combined total of 57% impairment of the right upper extremity" and interpreting Bledsoe's functional capacity test as limiting the claimant to sedentary jobs, Spradling opined that the claimant "is 100% permanently and totally disabled from any form of sustained gainful employment."  (R.  275-76).

Although Spradling makes a specific reference to Dr. Lance's August 13, 2008 opinion, that opinion does not appear to be part of the court's administrative record.  The Court Transcript Index makes no reference to Dr. Lance nor does the ALJ.  The court's examination of the index reflects only two sets of medical records dated 2008: Dr. Vetter's records (Exhibit 5F, R. 255-264) and records from Green County Hospital Physicians (Exhibit 6F, R. 265-273).  However, neither set of records contains a chart or other medical record from a doctor named Lance and those sets contain neither a document reflecting service rendered on August 13, 2008 nor a medical opinion with the August 13, 2008 date.

### The ALJ Hearing

After the Commissioner's denial of the request for benefits, the claimant received a hearing before the ALJ on September 27, 2010.  Claimant's attorney presented at the hearing one document that was not in the ALJ's list of proposed exhibits: a Vocational Rehabilitation Assessment by Joe Spradling.  The ALJ refused to accept paper copies at the hearing and instructed counsel to file the document electronically.

#### Claimant's Testimony

The claimant testified at the hearing that he is constantly in pain with a pain level of five on a ten-point scale, but that his "body wouldn't take" prescription pain medications because his blood pressure kept increasing on such medication.  (R. 60).  Instead, he takes Tylenol.  (R. 61).

10

On an average day, he watches TV and keeps his hand elevated on the back of the couch.  His sister-in-law, who lives next door, helps with the housework and brings food over for him. (R. 61, 74).  H also "move[s] around the yard a little bit."  (R. 74).

The claimant acknowledged that he drove himself to the hearing, using his left hand to steer, and routinely drives short distances such as to and from church.  (R. 62). He has difficulty walking to employment opportunities because his arm swells when it hangs down and the pain associated with the swelling bothers him; he must keep the arm elevated to avoid swelling, so he wears a sling on his arm when he has to walk a long way.  (R. 63, 69).  Besides elevating his arm, the only other way he alleviates the swelling is lying down.  (R. 78).  He would not give an estimate of how long he could walk at one time before experiencing swelling and pain in his arm. He also claims that he cannot stand for long periods. (R. 69-70).  The claimant testified that his arm condition is worsening, and that the pain increases in cold and cloudy weather.  (R. 67).  He also stated that the doctors wanted to operate on him, but that he "didn't want them to cut on me" and he acknowledged being "tired of going to the doctors" and not wanting to go to therapy because "they hurt me." (R. 73-75).

*Vocational Expert Testimony*

The ALJ provided several hypothetical questions to the vocational expert, Dr. Kessler. The first hypothetical assumed that an individual of the claimant's age and education could perform work at the medium exertional level with the following restrictions: temperature controlled environment, no driving, and no upper extremity pushing and/or pulling.  Using that hypothetical, the expert testified that the individual could perform several jobs that exist in significant numbers in the national and state economies, including the job of grinder if the

grinder job was in a temperature-controlled environment.   Using that same hypothetical but substituting light, unskilled work level, she testified that a number of such jobs existed in the national and state economy, including ticket seller - approximately 1,700 in the state and 76,500 in the country.  Using that same hypothetical but substituting sedentary unskilled work level, she testified that jobs existed in significant levels in the state and national economies.

The ALJ changed the hypothetical situation to involve an individual of the claimant's age and education with the following restrictions:  temperature controlled environment, no driving, no upper extremity pushing and/or pulling, *and only being able to use his right hand as a helper arm*.  In his hypothetical, the ALJ did not specify that the left hand was the individual's non-dominant hand or that the right helper hand had gripping, handling, or grasping limitations. Further, he did not mention any limitations on elevating the right hand or keeping it in a sling. Adding this limitation of using the right hand only as a helper hand, the expert testified that such an individual could not perform the claimant's past position as a grinder, and could only perform about half of the medium exertion level jobs identified.  At the light exertional level, such an individual would only be able to perform half of the machine operation and tending jobs (1,750 in the state; 116,100 in the nation). The expert stated that the hypothetical individual could perform the dish washing jobs at a "much slower" rate; however, because the expert did not originally list dish washing jobs at the light exertional level, she did not provide the number of such light jobs available.  The expert also testified that the hypothetical individual could perform the ticket selling job (approximately 1,700 at the state level and 76,500 at the national level) at the light level "without a great deal of difficulty."   At the sedentary, unskilled level, he would be able to perform inspection and most of the sorting jobs (1,100 in the state and 35,000 in the

12

nation for both inspection and sorting; however, the expert stated that he would be able to do "most" of the sorting jobs, so that number would be somewhat reduced).

Changing the hypothetical once again, the ALJ asked the expert to consider a "much more restrictive limitation," essentially treating the individual as a "one-armed individual who cannot use his other upper extremity or his right arm, specifically, as a helper hand." Under this hypothetical, the expert testified that he could not perform medium jobs or sedentary jobs and that the only light job he could perform would be "ticket selling, but he would be much slower." (R. 85). The expert did not specify the number of jobs available to a ticket seller who would function at a much slower rate.

Finally, the vocational expert testified that pain classified as four through six on a ten-point scale would be considered to be moderate pain, and would not preclude working. However, pain classified as seven and above would be in the moderately severe to severe range and would preclude an individual from all work. (R. 86).

The claimant's attorney asked the vocational expert to assume that the hypothetical individual of the claimant's age and educational background could not grip with his right hand, could not lift any weight with his right hand or arm, could lift no more than ten pounds with his left arm, could use his right hand to balance, and experienced constant pain of five on a ten-point scale. Under that scenario, the expert testified that assuming he could not grip or lift, he was essentially functioning as a one-armed individual. Therefore, she testified that no work would be available at the sedentary level and that the only position he was capable of performing in the light work category was that of ticket selling, but reiterating her prior testimony regarding performing the ticket selling as a one-armed individual, she acknowledged that "he would be

13

slower." The expert did not explain how the decreased rate of performing the task would affect the number of jobs available to the individual.

*The ALJ's Decision*

Going through the required steps of his analysis, the ALJ found at step one that the claimant had not engaged in substantial gainful activity since his alleged date of onset of disability, March 20, 2009. At step two, the ALJ determined that the claimant had the following "severe" impairments:  hypertension and complex regional pain syndrome of the right upper extremity.  At step three, he found that the claimant's impairments or combination of impairments did not meet or equal impairments in the grid listings.  At step four, the ALJ determined his residual functional capacity, considering his impairments, and evaluated whether that capacity allows him to perform the requirements of his past relevant work.  The ALJ found that the claimant retains the residual functional capacity to perform light work with the following restrictions: a temperature-controlled work environment, no driving, and no use of his right upper extremity except as a helper aid. The ALJ did not specify which movements or tasks the helper hand could or could not do, such as gripping, handling, lifting, reaching, fingering, feeling, and lifting.  The ALJ further found that the record does not establish any significant complications or problems arising from claimant's hypertension and further, that the record does not establish the claimant's experiencing more than a moderate level of pain.

To the extent that the claimant asserts other or more severe impairments and work restrictions, the ALJ found his assertions not credible, applying the Eleventh Circuit's pain standard.  Acknowledging the claimant's underlying medical condition stemming from his electrocution burns, the ALJ nevertheless pointed to evidence in the record, including the

14

claimant's own testimony, that his pain was generally five on a ten-point scale sometimes dropping down to four or up to six, but remaining below seven and in the moderate level.  He also addressed the claimant's assertion that he had functioned as a one-armed individual since 2006.  The ALJ noted that clinical findings disclosed that his right hand was capable of gripping, although at a diminished level (three out of five on the right compared to five out of five on the left).  Further, the ALJ pointed to the occupational therapy evaluation in August of 2009 indicating that, although the claimant is functioning as a one-armed individual, the therapist opined that with the non-dominant left hand, the claimant could perform the full range of jobs requiring light exertion, and also those requiring lower medium exertion, although when he worked with loads requiring both arms, he would be limited to ten pound loads.

The ALJ did not address the claimant's assertion that he must keep his right arm elevated to reduce swelling and associated pain.

In light of that residual functional capacity assignment, the ALJ concluded that the claimant could not perform his past job as a grinder; however, the ALJ determined that he could perform "light jobs as a ticket seller, 1700 of which exist in Alabama and 76,500 of which exist in the national economy."  Accordingly, the ALJ found that the claimant is not disabled and has not been disabled through the date of the decision.  (R. 28).

The ALJ did not assign specific weights to the medical evidence or, indeed, to any evidence except to say that Ms. Spradling's opinion that the claimant is "100% permanently and totally disabled" was "outweighed" by the vocational expert's testimony.  Because the paragraph before that conclusion referred to the vocational expert's testimony that Mr. McCarter could perform light jobs such as a ticket seller, albeit a slow one, the court concludes that  ALJ was

probably referring to that part of her testimony as outweighing Ms. Spradling's conclusion.  (R. 26).

## VI.  ANALYSIS

The claimant argues that the ALJ failed to assign specific weight to the evidence presented with the possible exception of evidence from the vocational experts, Dr. Kessler and Jo Spradling.  The Commissioner acknowledges that "the ALJ might not have set forth the weight he afforded to each of the opinions of record with the numerical certainty Plaintiff may have preferred," but insists that "it is clear from his decision that he considered each opinion in great detail and adopted those limitations he found consistent with the evidence."  (Commr.'s Br., doc. 10, at 10).   For the reasons stated below, the court agrees with the claimant.

"Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop of full and fair record." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).   As part of that obligation, the ALJ must also "make clear the weight accorded to the various testimony considered."  *Id.*  The reason behind the requirement of assigning weight is that the failure to provide an explanation of how and why the ALJ reached the determination means that "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Id*.  Put another way, if the ALJ does not fulfill his duty, the district court reviewing that decision cannot, in turn, adequately fulfill its own.

In the instant case, the ALJ did not assign specific weight to any evidence other than that of the vocational experts.  Although the Commissioner indicates that what the ALJ accepted and rejected is "clear" enough in his decision, the court finds that information less than clear.  And,

16

because the court has the task of ensuring that the ALJ's decision is rational and based on substantial evidence, knowing what evidence he rejected and what he accepted is crucial to this court's performance of its task.

As an example of the lack of clarity, the ALJ did not specify the weight he accorded to Dr. Meleth's findings, including his findings that the claimant has an impaired right hand grip, that he has no movements in his right thumb and index finger – the key digits for grasping and fingering, that he has diminished movements in the other three fingers, and that he must keep his right hand elevated at all times to avoid swelling. If the ALJ accepted these findings, he should have said so and should have specifically incorporated them into his residual functional capacity determination and his hypothetical posed to the vocational expert. However, that RFC determination and the hypotheticals posed did not include any reference to right hand elevation at all times nor did the ALJ specify – when he indicated that the claimant would use the right hand as a "helper hand" – that the helper hand was significantly limited in grasping, fingering and also that gripping was impaired. Of course, in some jobs, grasping, fingering, and gripping are not of paramount importance. Given that the ALJ specifically concluded that the claimant was employable as a ticket seller, however, common sense dictates that these limitations would potentially have an impact on the claimant's ability to perform that particular job. Indeed, the vocational expert testified that if the "helper hand" could not grip, that limitation would affect the speed at which he could perform the job, making him "much slower" as a ticket seller. She did not have an opportunity to testify about the impact on his ability to perform the job if the helper hand must be constantly elevated, because that limitation was never posed as part of the presented hypotheticals, despite the findings in doctor records supporting the claimant's

17

assertions of edema and the claimant's repeated focus on significant swelling in his hearing testimony.

If, on the other hand, the ALJ rejected Dr. Meleth's findings, he should have said so and explained the reason for that rejection, so the court could judge whether substantial evidence supported that rejection. In short, the court cannot determine from the decision what part of Dr. Meleth's decision the ALJ accepted, if any, what part he rejected, if any, and what part he ignored completely, if any.

Dr. Meleth's findings are not the only ones to whom the ALJ failed to accord specific weight.  As another example, the ALJ also failed to state the weight he assigned to Dr. Chastain's findings, and failed to include in his RFC determination and hypotheticals posed to the vocational expert specific limitations that Dr. Chastain established, such as never balancing; only occasionally crawling; the inability to reach, handle, finger, or feel with the right hand and right upper extremity; the avoidance of all exposure to unprotected heights; and the avoidance of vibrations involving the right upper extremity.  Once again, without information from the ALJ about what he accepted or rejected from Dr. Chastain's findings, the court cannot clearly determine that substantial evidence supports the ALJ's decision.

In sum, the court finds that the ALJ has failed to develop a full and fair record.


## VII. CONCLUSION

For the reasons stated, this court concludes that the claimant was denied a full and fair hearing before the ALJ.  Accordingly, the decision of the Commissioner is due to be REVERSED and REMANDED.

The court will enter a separate order in accordance with this Memorandum Opinion.

Dated this 28th day of March, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

19